TYSON, Judge.
Jimmy R. Coleman, was indicted for murder in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant “guilty of the lesser included offense of criminally negligent homicide.” At the sentencing hearing the appellant was sentenced to 12 months’ imprisonment in the county jail, ordered to pay restitution in the amount of $23,700 and to pay $25 to the Victims’ Compensation Fund.
Otis Martin testified on December 21, 1984 that, after going bird hunting, he went to the Big Buck Hunting Club and had dinner. After 9:00 p.m. Martin left the club with David Haggard, the victim. The two men went to Bodka Creek Lounge and stayed until 2:30 or 3:00 a.m. Outside the lounge, Martin and the victim encountered the appellant and discussed riding to Shu-qualak. The appellant got his gun from his car and placed it in Martin’s truck. The three men left together in Martin’s truck with the victim driving. All three men had been drinking alcohol. While in the vehicle the appellant and the victim engaged in an argument about who could “whip” the other. (R. 28).
Martin stated that around 5:00 a.m. the victim stopped the truck. The appellant pulled his gun and placed it against Martin’s stomach and stated “he would blow me away ...” (R. 33). The appellant then went around to the driver’s side of the vehicle and the victim shouted “don’t shoot”. (R. 35). The appellant then fired the gun into the air. The victim and the appellant moved around to the passenger’s side of the truck where Martin heard “scuffling”. (R. 38). The victim then said “Otis, he’s cut me, he’s cut me.” (R. 38-39). Martin got out of the vehicle and went to the victim.
After Martin asked appellant two or three times, appellant helped Martin place the victim, Haggard, in the truck. The victim was bleeding at this time but the appellant, Coleman, did not appear to be injured.
The three men proceeded to Gainesville, Alabama, where a man later identifed as Goodwin was asked to call an ambulance and also the police.
Larry Rigsby, an internal medicine doctor, assisted Dr. Furshia in the victim’s surgery. Dr. Rigsby testified that the reason for the surgery was “he [the victim] had multiple stab wounds to the abdomen and the flank.” (R. 114). Dr. Rigsby stated that there were lacerations at the tip of the spleen, to the pancreas and to the left kidney. Part of the pancreas had to be removed due to the laceration to the pancreas. There was a substantial amount of *967 blood loss due to the laceration of the vein to the kidney.
The surgery lasted almost five hours. Approximately 25 minutes after the victim was taken to the recovery room, he went into cardiac arrest. When the victim arrived in the recovery room, he had a “reasonable blood pressure.” (R. 134).
Without surgery, Dr. Rigsby testified, the victim would not have survived the laceration to the left kidney vein. Dr. Rigsby stated that the cause of the victim’s death “was directly related to the stab wounds.” (R. 135).
At 2:45 p.m. the mast trousers used to help stabilize blood pressure were removed. Cardiac arrest occurred at 3:05 p.m.
Dr. Rigsby testified that Dr. Furshia, who Dr. Rigsby assisted in the surgery, was now living in Baltimore, Maryland.
Bruce Henderson stated that the appellant, the victim and another man came to the store, which he was running, around 5:00 a.m. and purchased some gasoline. These men all appeared to have been drinking.
Robert Goodwin testified that he stopped at Smith’s Grocery Store around 6:30 a.m. Martin entered the store and said “you need to call an ambulance. There’s been a stabbing.” (R. 162). Goodwin went to the truck and saw that the victim was bleeding from his stomach. Goodwin had passed the appellant on the way to the truck and stated that the appellant was holding a shotgun and walking toward the store.
When Goodwin was returning to the store, the appellant asked Goodwin to take him to Shuqualak. Goodwin told him no.
Goodwin saw the appellant still holding his shotgun getting into two different cars, but left each car when the drivers became frightened. Goodwin heard the victim tell Martin, “I think I’m fixing to die. I’m stabbed deep.” (R. 174).
Richard DeRamus stated that he was at Smith’s Grocery Store when the appellant and the other two men arrived. The appellant, holding his shotgun, told DeRamus, “I was going to carry him to Shuqualak. He told me he had to go to Shuqualak, that he couldn’t be caught in Alabama.” (R. 182-183). DeRamus told the appellant that he could not take him.
The appellant, while in the store, asked for anyone's keys to their vehicle, but no one gave him their keys. DeRamus testified that the appellant then said there had “already been one murder, he couldn’t make it a robbery.” (R. 183).
DeRamus saw the appellant get into Ms. Eddins’ automobile but Ms. Eddins resisted and the appellant left her car.
Charlie Harris stated that, while he was pumping gas at Smith’s Grocery Store, the appellant, with a shotgun in hand, approached Harris and asked Harris to take him to Shuqualak. Harris refused and the appellant told Harris he would take Harris’ automobile. Harris would not give the appellant his keys and the appellant then attempted to take Eddins’ car.
Sarah Eddins testified that she was at Smith’s Grocery Store when the appellant, while holding a gun, got into her car and grabbed the steering wheel. Eddins grabbed the appellant and started blowing the horn. The appellant told Eddins, “I’ll kill you.” (R. 200). When Eddins let go of the appellant, he left her automobile.
Tom McDanal, deputy sheriff for Sumter County, responded to a call at Smith’s Grocery Store. McDanal stated that the appellant smelled of alcohol but that he found no gun.
Ed Billingsley, investigator for the Sumter County District Attorney’s Office, interviewed Martin and received a shotgun from him. Billingsley is also the coroner for Sumter County and he prepared the death certificate of the victim.
The State rested and the appellant’s motion for judgment of acquittal was denied by the trial judge.
Ed Adcock, the appellant’s first witness, stated that he went with the appellant on December 21,1984 to Bodka Creek Lounge. While at the lounge the appellant did not argue with anyone. Upon leaving the lounge the appellant decided to go with Martin and the victim but first got his gun *968 out of the car that Adcock was in. Adcock stated that he left the lounge around midnight.
Adcock, who was present when the pictures of the appellant were taken, identified three pictures as being made on December 24, 1984. These pictures showed a cut mark and bruises to the appellant's neck, collar bone and chest.
Adcock admitted on voir dire that he did not know if the appellant had these bruises and cut marks before the appellant left the Bodka Lounge on December 22, 1984.
Lisa Smith testified that she saw the appellant and the victim at the Bodka Creek Lounge on December 21 and 22, 1984. The victim removed a hat from Lisa’s head which she asked the appellant to retrieve. When the appellant asked for the hat, the victim pulled out a knife. The appellant and Lisa immediately walked outside. The victim went outside also and gave Lisa her hat. Lisa left the lounge around 2:80 a.m. and testified that Adcock was still there when she left.
Teresa Smith’s testimony about the victim pulling the knife was substantially the same as Lisa’s testimony. Teresa stated the victim did not touch her or try to touch anyone with the knife.
Rodney Daniels, a registered nurse, testified that on December 22, 1984, he was working at the Livingston emergency room. When the victim arrived in the emergency room, he had multiple stab wound. Mast trousers were inflated on the victim and he was in shock when he arrived at the hospital.
The hospital record showed the victim left the operating room at 2:55 p.m. The record stated that the mast trousers deflated at 2:45 p.m. At 3:05 p.m. the victim went into cardiac arrest. At 2:55 p.m. the victim’s blood pressure was 116 systolic which Daniels affirmed was “pretty good”.
Dr. Joe Howell, a general practitioner, testified that when the victim came in the emergency room he was suffering from multiple stab wounds. Dr. Howell did not assist in the victim’s surgery. Dr. Howell stated that standard technique for deflating trousers is to do so very slowly. In the victim’s case, Dr. Howell’s opinion was that the trousers had been deflated in a period of time consisting of an hour. Dr. Howell stated that deflating mast trousers at 2:45 p.m. “could be the cause” for cardiac arrest of the victim. (R. 384).
Dr. Howell testified that he did not know absolutely the cause of the victim’s cardiac arrest. Dr. Howell affirmed the hospital record which stated, “deflated at 2:45 p.m.” One could not tell from the record whether the mast trousers were gradually deflated in the operating room. (R. 385) A 116 systolic blood pressure of the victim when he left the operating room was good according to Dr. Howell. Also, Dr. Howell affirmed that deflating the mast trousers would take some pressure off the newly-sewn sutures.
Raymond Byrne was employed by the Livingston Police Department in December, 1984. He testified that he had a conversation with the victim which Byrne taped. The tape was made in the ambulance at Smith’s Grocery Store. On the tape the victim stated that he had no idea who stabbed him.
The appellant contends that the State did not present sufficient evidence from which the jury could infer that the victim’s death was caused by the criminal agency of the appellant or that appellant killed the victim by stabbing him.
The appellant argues that the State did not prove that the appellant stabbed the victim and, therefore, the conviction should be overturned.
As set out in the facts of this case, the testimony of Martin showed that an altercation between the appellant and the victim occurred and the victim stated that he had been “cut” during this altercation. The victim was bleeding when Martin placed the victim in the truck. The agreement between the three men was to tell everyone that someone other than the appellant had stabbed the victim. Numerous other people testified that they saw the three men together and that the victim was wounded. Dr. Rigsby testified that the surgery of the victim was due to multiple stab wounds. *969 Dr. Howell and Daniels stated that the victim arrived at the Livingston emergency room with multiple stab wounds.
In this case there was more than circumstantial testimony to show that the appellant, Coleman, stabbed the victim. There was eyewitness testimony that the appellant was the only one in close proximity to the victim when the victim was stabbed.
Nevertheless, we will examine this case as a conviction based on “circumstantial evidence” as to whether the appellant stabbed the victim, Haggard. Austin v. State, 434 So.2d 289, 291 (Ala.Crim.App.), cert. denied, 434 So.2d 289 (Ala.1983), reads as follows:
“In Cumbo v. State, 368 So.2d 871 (Ala. Cr.App.1978), cert, denied, 368 So.2d 877 (Ala.1979), this court set out the following rules:
‘In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.
[[Image here]]
‘Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant’s guilt is a question for the jury and not the court.
[[Image here]]
‘The true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be “such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.” [Citations ommitted]’ ” Id.
In reviewing the evidence as set forth in the facts of this case, the State offered sufficient evidence from which the jury could exclude every hypothesis except that the appellant stabbed the victim.
The appellant argues that the State did not prove the cause of death of the victim was based on the criminal agency of the appellant, but was due to the hospital’s negligence in deflating the mast trousers on the victim.
Dr. Rigsby testified the cause of the victim’s death was related to the stab wounds. This was sufficient to show the cause of death was related to the stab wounds.
Section 13A-2-5(a), Code of Alabama 1975 states:
“A person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the • concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient.”
In Finley v. State, 405 So.2d 161, 162 (Ala.Crim.App.1981) this court stated:
“Appellant moved to exclude the State’s evidence arguing that, among other things, the State had not excluded pre-ex-isting ailments or intervening agencies as causes of death. It is clear, however, that the unlawful act of the accused need not be the sole cause of death. Even if the defendant’s act was only a partial cause accelerating death, the defendant is responsible.” (Citations omitted)
Under this authority in this cause, assuming arguendo that, if there were negligence at the hospital, it did not negate the appellant’s unlawful act of stabbing the victim, Haggard. It should be noted that this court does not decide the issue of whether vel non negligence occurred at the hospital.
*970 Therefore, from this trial record there was sufficient evidence from which the jury could infer that the victim’s death was caused by the criminal agency of this appellant.
For the reasons herein stated, this cause is, hereby, affirmed.
AFFIRMED,
All the Judges concur,